## UNITED STATES v. IMPERIAL CHEMICAL INDUSTRIES, Ltd. et al.

United States District Court,
S. D. New York.
May 16, 1952.

J. Howard McGrath, Atty. Gen., Leonard J. Emmerglick, Special Asst. (Ephraim Jacobs, Samuel B. Prezis, Washington, D. C., Joseph M. Fitzpatrick, Arlington, Va., H. G. Morison, and Marcus A. Hollabaugh, Washington, D. C., of counsel), for plaintiff.

Covington, Burling, Rublee, O'Brian & Shorb, Washington, D. C. (John Lord O'Brian, Gerhard A. Gesell and Charles F. Barber, all of Washington, D. C., of counsel), Root, Ballantine, Harlan, Bushby & Palmer, New York City (John M. Harlan, Edward L. Friedman, Jr. and Charles E. Stewart, all of New York City, of counsel), for E. I. duPont deNemours & Co., Lammot duPont and Walter Samuel Carpenter, Jr.

Coudert Brothers, New York City (Mahlon B. Doing and Joseph A. McManus,

New York City, of counsel), Hughes, Hubbard, Blair & Reed, New York City (L. Homer, Surbeck, Richard W. Hogue, Jr. and Powell Pierpoint, all of New York City, of counsel), for Imperial Chemical Industries, Ltd. and Imperial Chemical Industries (New York) Ltd.

Donovan, Leisure, Newton, Lumbard & Irvine (J. Edward Lumbard, Jr., Richard Y. Holcomb, Douglas V. Lewis and John F. Seiberling, Jr., all of New York City, of counsel), for Remington Arms Co. and Charles Krum Davis.

RYAN, District Judge.

We now approach the task of formulating a final decree designed to prevent and restrain the violations of law which we have found. 15 U.S.C.A. § 4.

■ Our objective is to fashion, in the terms of a decree, means by which the agreement found to exist is terminated, its revival prevented and its effects destroyed by the reestablishment of competitive conditions insofar as they pertain to United States exports and imports. The decree must be based upon the facts as we have found them, and designed to be carried out with a minimum of judicial supervision and control of the future activities of the defendants. Cf. United States v. N. Y. Coffee & Sugar Exchange, 1924, 263 U.S. 611, 44 S.Ct. 225, 68 L.Ed. 475.

Where competition has been eliminated, it must be restored. Only those provisions reasonably necessary to accomplish correction and adjustment of a dislocated competitive situation may be applied.

The essence of the violation found was the unlawful agreement to divide world territories. It was this enduring and basic understanding which was fundamental to all of the dealings of the conspirators. It was to accomplish this purpose and end that the various means were adopted.

[2] The decree will contain injunctions prohibiting agreements and arrangements between the defendants dividing territory and allocating customers and markets so as to unlawfully limit the commerce of the United States. DuPont shall not be permitted to make agreements restraining their exports throughout the world, and particularly to those markets which have been previously assigned to ICI as its exclusive territory, and to those countries in which the jointly-owned companies functioned. DuPont shall file with the court annually for a period of five years reports showing specifically the nature and extent of their efforts to increase their foreign trade.

We shall retain jurisdiction over all the defendants for a period of five years after the entry of judgment for the purpose of enabling the court to either modify the relief granted or to grant such other or additional relief required to accomplish the purpose of the decree and to terminate the restraints on United States trade and commerce which have been or during that period are found to have been created or imposed by acts of the defendants or any of them.

The final decree will contain general injunctive provisions directed to the defendants which are calculated to prevent effectively a continuance or revival of the agreements and understanding between ICI and duPont. The decree, however, must contain additional provisions to implement these injunctive directions, so that they are made probable of observance. The jointly-owned companies and the patents, processes and technologies of the defendants must be brought within the scope of the judgment.

The physical properties and stockholdings in the jointly-owned companies constituted part of the means by which the unlawful agreement to divide world trade was brought to fruition.

The restraints sought to be accomplished were achieved also in part by the patents and processes agreements. The patents held by the defendants did not give them control of all the products covered by their understanding; as to many products, control resided in their technology and trade know-how. As to other products, control was possible because of the size of their industrial and selling organizations, and the foothold they enjoyed in the markets divided. This placed them in a position where acting jointly it was possible for

them to meet and regulate, if not overcome, the competition offered by others.

■ It was not required of the Government to establish that the defendants had power to control the markets they agreed to divide and allocate, since the suit was filed for violation of Section 1, 15 U.S.C.A. § 1. American Tobacco v. United States, 1946, 328 U.S. 781, 809, 66 S.Ct. 1125, 90 L.Ed. 1575. Although this is so, we must in determining the extent of the restraints give consideration to the position of dominance held by the defendants. We conclude that restraints must be imposed upon not only the exercise of the patent monopolies but also with respect to technology and know-how, as well as their commercial activities.

We shall first consider the extent of the relief which is to be granted with respect to patents and technology.

While the maintenance of a competitive economy is of prime importance, we may not seek to achieve that end by unwarranted judicial whittling down of patent rights or by the insertion in the decree of provisions for which there is no support in law.

We have found that the exchange of patents, processes and know-how served as direct instruments used by the conspirators to achieve their unlawful purpose.

■ A patentee may, if he sees fit, reserve to himself the exclusive use of the discovery or he may license those of his own choice and selection to use it. But evil lies in the illegal use of this lawful right; by concert of action between the conspirators the full and complete exploitation of the patents was prevented by the allocation of territories and agreed restraints placed upon the employment of the patents. The rights of the patentees were exercised for a purpose not intended by our patent laws and in derogation of vested and paramount rights of the public. Such misuse of the patent renders the future use of those rights subject to and amenable to judicial control to prevent a continued or new abuse. The misuse of a patent may result in denial of relief to the patentee whether he proceeds against a direct or contributory infringer, Katzinger Co. v. Chicago Metal-

lic Mfg. Co., 1947, 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374; but see, Bruce's Juices v. American Can Co., 1947, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, on availability of defense of violation of anti-trust law in actions on a contract. In private litigation misuse of patents in anti-trust violation constitutes a defense which may be pleaded; in litigation instituted by the Government such misuse affords basis for injunctive relief of both a restrictive and mandatory nature; in neither may the misuse result in a judgment of forfeiture of all patent rights. "The limited monopolies granted to patent owners do not exempt them from the prohibitions of the Sherman Act and supplementary legislation." Standard Oil Co. v. United States, 1931, 283 U.S. 163, 169, 51 S.Ct. 421, 423, 75 L.Ed. 926.

We do not accept as correct the proposition that compulsory license of United States patents is appropriate only in those instances where required to remove specific restraints upon the manufacture and sale of specified products in the United States caused by the unlawful use of patents to suppress domestic competition. To do so would be to make nugatory the dual aspects of our anti-trust laws, which make unlawful restraints placed upon our foreign trade as well as our domestic commerce. It is true that in most cases in which compulsory licensing has been decreed, it has been found that the patents have been unlawfully used to suppress domestic competition. Not many actions have been instituted to suppress restraints upon our foreign trade, resulting from agreement among international industrialists to which Americans have made themselves parties. We have had few suits which have presented a situation similar to that revealed here, and which call for remedies we now find necessary.

Although no charge has been made of monopolization and no evidence presented to sustain such a charge, we find that the principal defendants are potent factors in the fields in which they have engaged. Their important position, in these industries was such that it made their unlawful understanding not the fanciful dream of wishful entrepreneurs but an existing situ-

ation which enabled them to see its accomplishment throughout the world. Here, there was not a mere attempt to allocate territories; restraints upon our foreign trade were in fact accomplished.

■ The Government has asked that compulsory licensing be decreed of future as well as existing patents and technology. The power of the court to direct licensing does not arise in this case from a unilateral decision by a patentee to refrain from using the patent. Such a course, prompted by legal motives would be well within the rights of a patentee. Cf. Special Equipment Co. v. Coe, 1945, 324 U.S. 370, 65 S. Ct. 741, 89 L.Ed. 1006.

■ We decree compulsory licensing because the patent rights which were granted the defendants were misused. The failure to export products manufactured under the patents resulted from the agreement to divide territories. What might have been done lawfully by one, acting as a result of his own decision, became unlawful because it was brought about by common agreement. The failure to export, which might have been legal in itself, also became unlawful because of the purpose and end it was employed to accomplish. One of the means employed was the patents and processes agreements. The needs and requirements of local markets from which the patentee was excluded by the underlying agreement were met by patent grants to fellow conspirators. Thus, the patent themselves and the right to grant licenses under them were used to implement and carry out the allotment of territories. The use of these existing patents must be regulated because of their past abuse.

■ But it does not follow that there is need for the regulation of the use of future patents and future technology. Patents which had not been granted, and technology which had not been developed could not have been put to misuse in the past. We may not act entirely upon an assumption that the defendants will continue in their disregard of the law and violate the injunctions of a final judgment. Cf. Timken Roller Bearing Co. v. United States, 1951, 341 U.S. 593, 604, 71 S.Ct. 971, 95 L.Ed. 1199 We may not take from the defendants all incentive for future endeavour by depriving them in advance of the rewards which might come to them from future patents and technology. Such relief "would discourage rather than encourage competitive research." United States v. National Lead, 1947, 332 U.S. 319, 359, 67 S.Ct. 1634, 1653, 91 L.Ed. 2077.

That the property rights in these patents may be substantial and the incentive and desire of duPont to develop and explore further possibilities is real cannot be disputed. DuPont is spending approximately $45,000,000 a year on research and has recently placed in operation an experimental station costing $30,000,000. Its past development of new products and processes has done much to promote our national economy and to meet the needs and requirements of national defense. We shall impose no unnecessary restrictions to interfere with the continuance of these activities. The evidence also establishes that duPont spent about $45,000,000 on nylon research and has invested $196,800,000 in plants and facilities for nylon production.

Although in National Lead compulsory licensing was decreed as to patents "issued to, or acquired by, any of the appellant companies within five years from the date of the decree", 332 U.S. at page 348, 67 S.Ct. at page 1648, it was limited to a single product—"titanium pigments or any process for the manufacture of such pigments". In Hartford-Empire Co. v. U. S., 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322, compulsory licensing was limited in respect to future applications and resulting patents to a group of machines designed to perform particular functions in the glassware industry. 323 U.S. at page 417, 65 S.Ct. 373. In United States v. U. S. Gypsum Co., where the term for compulsory licensing of future patents was left to the discretion of the trial court, a single product was involved—gypsum board. 1950, 340 U.S. 76, 90, 71 S.Ct. 160, 95 L.Ed. 189. To include here the future patents and new processes of large research organizations, sweeping in a vast variety of chemical products, would be punitive as well as destructive of that driving incentive which has accounted

for much of the remarkable development of the chemical industry.

What patents and technology are we to say then belong to the past and what to the future? We have had evidence from which we find that the basic understanding, although modified in part was not abandoned in whole, but was continued down to the conclusion of the trial. We ·fix then, June 30, 1950 as the date which will mark the time between the past and the future for the purpose of our decree and govern those provisions which direct the compulsory licensing of patents and technology.

We shall add, however, to these present patents all improvement or new patents in relation to any product with respect to which the defendants are obligated by existing agreement to grant licenses to each other or to third parties, or which are required to be licensed under the terms of our decree.

The Government seeks a decree directing the granting of compulsory licensing on a reasonable royalty basis of many of duPont's and ICI's United States patents; as to the nylon patents, however, it asks for compulsory royalty free licensing.

We have had no evidence submitted as to many of the products covered by these patents, or as to the effect of the unlawful use of the vast majority of these patents and technologies. What has been presented has dealt only with the patents and processes agreements, the negotiations which led to them and the operations under them which throw light upon the interpretations given them. Proof as to sales of specific products has been meagre and confined to a few items. We are therefore not in a position to direct a general compulsory licensing of either patents or technology. We are restricted to those patents and technologies which cover products common in manufacture to both ICI and duPont, or to either of them and any of the jointly owned companies.· Cf. United States v. Paramount Pictures, 1948, 334 U.S. 131, 152, 68 S.Ct. 915, 92 L.Ed. 1260; Schine Chain Theatres v. United States, 1948, 334 U.S. 110, 127–130, 68 S.Ct. 947, 92 L.Ed. 1245. These products were directly subject to the restraints imposed by the basic understanding for the division of world trade.

We pause now to note that the various patents and technologies involved were not as a result of the joint efforts of the defendants. Although there was a constant exchange of research progress and an unceasing flow of technical information between the defendants there is no evidence to support the conclusion that either the patents secured or the technology practiced by the defendants came to them as "benefits of their conspiracy." Schine Chain Theatres v. United States, supra, 334 U.S. at page 128, 68 S.Ct. at page 957. In fact, of three major fields of patents— nylon, polythene and neoprene—quite the contrary is true. Nylon was developed solely by duPont and with great secrecy. It was not until duPont research was well advanced that ICI was first informed of it. Polythene was entirely the product of ICI; the part duPont took in its further development was primarily to aid the joint war effort of the United States and Great Britain, not to advance the unlawful understanding between the defendants. Neoprene was initially licensed by a third party to duPont; ICI did nothing to improve it. We cannot conclude on the proof before us that the duPont and ICI patents were products or results of their unlawful agreement to divide world markets.

The validity of no patent was questioned by the Government. For the purposes of this decree we are then encompassed by the factual finding that not only were the patents validly issued but also that they are lawfully owned by the record holders. The power of the court to direct the issuance of royalty free licenses on any of these patents is open to serious question. Cf. Hartford-Empire Co. v. United States, supra, 323 U.S. at pages 413, 414, 65 S.Ct. 373. To provide for the issuance of royalty free licenses with respect to any of these patents would be to destroy the total value of the patent. We find no statutory authority for decreeing such remedies. That the granting of such relief would raise a

substantial constitutional question has been recognized. For, it has been written:

"That a patent is property, protected against appropriation both by individuals and by government has long been settled. In recognition of this quality of a patent the courts, in enjoining violations of the Sherman Act arising from the use of patent licenses, agreements, and leases have abstained from action which amounted to a forfeiture of the patents." Hartford-Empire Co. v. United States, supra, 323 U.S. at page 415, 65 S.Ct. at page 387.

It appears that the question of the constitutionality of such a provision was later noted but not passed upon in United States v. National Lead, supra, 332 U.S. at page 349, 67 S.Ct. 1634.

It has apparently been the consistent policy of the Government to seek decrees which would in effect nullify the patents which have been used as a means to accomplish the restraints imposed. But in U. S. v. National Lead, D.C., 63 F.Supp. 513, the trial court refused to direct royalty free licenses and this was approved by the Supreme Court. 332 U.S., 353, 359, 67 S. Ct. 1634. In Hartford-Empire, Mr. Justice Roberts writing for the majority struck from the decree of the trial court the provision requiring compulsory royalty free licensing.

On at least three occasions the Supreme Court has refused to grant like relief to the Government with respect to know-how. Hartford-Empire Co. v. United States, supra.

■ We would read the Morton Salt Case, (Morton Salt Co. v. C. S. Suppiger Co.) 1942, 314 U.S. 488, 788, 62 S.Ct. 402, 86 L.Ed. 363, and B. B. Chemical Co. v. Ellis, 1942, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367, as holding not that the patentee lost all right to injunctive relief but only that such relief was to be denied him so long as anti-trust violations continued. Misuse of patent rights does not work a forfeiture of the patent; it only suspends the right of the patentee to obtain judicial relief so long as his misuse continues or its effects have not been dissipated.

We do not read either Morton Salt or the Mercoid case (Mercoid Corp. v. Minneapolis Honeywell Reg. Co.), 1944, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396, as supporting the proposition that a patent is forfeited and the right to royalties destroyed by violation of the anti-trust laws. In Morton Salt injunctive relief was denied because the license for the use of a patented machine required the purchase from the licensor for use in the machine of an unpatented article. No evidence was received to sustain a finding that the anti-trust laws had been violated. In Mercoid, although Mr. Justice Douglas wrote that injunctive relief should be denied the patentee because he had violated the anti-trust laws and therefore could not seek equitable relief, the four concurring justices it seems rested their decision on the Morton Salt case and not upon a finding of a violation of the Sherman Act. Hartford-Empire held that reasonable royalty licensing rather than royalty free licensing was proper.

Nor do we interpret the provisions in the Alcoa decree, United States v. Aluminum Co. of America, D.C., S.D.N.Y. 1950, 91 F.Supp. 333, as a ruling contrary to the view that compulsory royalty free licensing is confiscatory. In that case, we find that Alcoa granted the Government royalty free licenses under three basic patents with the right to sublicense also on a royalty free basis. It was also provided Alcoa would receive a non-exclusive royalty free license under any improvement patents developed by the Government or its sublicensees during the lifetime of the original patents. The decree struck down the grant-back provisions as being impediments to effective competition in the industry. This action, the Government urges as a precedent for the granting of royalty free licenses by decree of a trial court, for it is argued that the only consideration for the original licensing was the grant-back provisions. However, we observe from study of the record and the decree, first, that the decree does not restrain Alcoa from exact-

ing royalties from those other than the Government to whom it might grant licenses under these same patents in the future and, second, that the striking down of the grant-back provisions did not take from Alcoa its entire consideration and compensation for the licensing grants it had made to the Government. The grants were but part of an entire transaction by which Alcoa acquired from the Government valuable manufacturing facilities. These remained with Alcoa; thus, it was permitted to retain at least part of the consideration for the licenses granted to the Government. We do not accept the Alcoa decree as establishing precedent for the granting of royalty free licenses.

We hold that in the circumstances before us, compulsory royalty free licensing may not be decreed in the absence of legislative authority and the sanction of explicit interpretation of existing statutes by higher courts affirmatively permitting such action.

An inventor may choose to keep his invention secret, and run the risk of its disclosure, or of having someone else conceive the same idea. He balances these chances; when he decides to make application for a patent, he determines to avoid them and to rest in the security of a patent which insures to him the privilege of excluding all others from the practice of the invention for 17 years. When he accepts the special privilege of a patent, he obligates himself to exercise his patent rights in conformity with the law. Misuse of these rights for an unlawful purpose subjects their further use to regulation and control; in this respect patent rights do not differ essentially in character from any other rights which the law creates or recognizes. The power of this court to provide "further assurance against continued illegal restraints upon interstate and foreign commerce through misuse of these patent rights * * * through the compulsory granting to any applicant therefor of licenses at uniform, reasonable royalties under any or all patents defined in the decree", was settled in National Lead, 332 U.S. at page 348, 67 S.Ct. at page 1648.

It was not required of the Government to present proof of specific damage or harm to any competitor as a result of the misuse of the patents by ICI and duPont. The misuse of patents effected a violation of anti-trust legislation; as such it was an offense against public policy and necessarily harmful to a substantial important public interest; "the suppression of competition in international trade is in and of itself a public injury; * * *." National Lead, 63 F.Supp., at pages 513, 525.

We have found that the patents and processes agreements "did, in operation, result in restraints of United States trade." (Op. p. 203) duPont agreed to restrict its use of United States patents by undertaking not to ship products manufactured under these patents to the territory assigned exclusively to ICI. To make this restriction effective, duPont was also required to impose like limitations on the shipments of anyone whom it might license under its United States patents. Insofar as shipments to Great Britain were concerned, the restrictions imposed by agreement were further implemented by the granting to ICI of exclusive licenses under the British counterparts of the United States patents. Thus, the exclusionary right under the British patents was applied against imports from the United States, and the basic understanding by which ICI recognized the United States as the exclusive territory of duPont was in turn observed by the granting of an exclusive license to duPont in the United States. This kept the patented products manufactured in the United States out of the market of Great Britain, and the like products manufactured in Great Britain out of the United States.

The agreement between ICI and duPont also brought about a situation by which the United States patents of both were placed in the hands of duPont. This was a pooling of patents for a purpose in restraint of foreign trade. This use of patent rights was condemned in United States v. Line Material Co., 1948, 333 U.S. 287, 311, 68 S.Ct. 550, 92 L.Ed. 701, when employed as a means to effect price fixing arrangements. Line Material was, like the

instant suit, brought under Section 1 and neither monopoly nor domination was charged. We have held that when patents are pooled to carry out a division of territories, it is equally as unlawful as when they are unified to effect price fixing.

The remedy of compulsory licensing is not to be restricted to monopoly situations. An effect of compulsory licensing is to grant to the public a right to use the patented invention and thus remove an impediment to competition. The wrong it is designed to correct arises from the misuse of lawful patent rights pursuant to an unlawful agreement. Such misuse creates an extension of the patent monopoly. Here, we have had proof of a wrong—unlawful restraints on our trade—accomplished by agreement between ICI and duPont. It was made possible of performance by the voluntary abstention from trade by one in the exclusive territory of the other, and the restrictive provisions in patent licenses and in technology exchanged. We may hope to compel an abandonment of limitations in the exchange of patents and technology which are used to violate the anti-trust laws only by decreeing that ICI and duPont grant to all others what they have heretofore granted to each other. It may be that the decree will permit them to make better and more profitable terms for the additional grants than they have heretofore demanded *inter sese*.

The result of these restrictions is shown in part by our later observations concerning polythene. It is acknowledged by ICI's recent investment in Arnold, Hoffman & Company, Inc. of Rhode Island. We are now told that in 1949, ICI's exports to the United States amounted to a little over $500,000. In 1950 with the full force of devaluation, the figure rose to almost $5,-500,000 and in the first nine months of 1951 it stood at over $4,000,000. With a present investment in this company of $5,835,000 ICI contemplates making further loans. The gates shut on our foreign trade have been pried open by this litigation; compulsory licensing will serve to keep them open and promote the flow of foreign trade to and from the United States.

We have not made ineffectual the employment of the means ICI has acquired through its investments in Arnold, Hoffman to exploit its future inventions in the United States. We note that this company's present activities are confined principally to dyestuffs and insecticides; we leave incentive for its further development unimpaired by refusing to grant compulsory licensing of future patents and inventions, save in those cases where ICI is already under obligation to do so to others.

The provisions of the belated 1948 agreement eliminate all the patent barriers which might have prevented ICI from exporting patented products to the United States, but these provisions will do no more than tend to increase the competitive potential between ICI and duPont. We are also concerned with increasing the possibility of competition between ICI, duPont and others who might desire to enter the field. The unquestionable right of ICI to determine whether or not it will manufacture under its American patents, to select its licenses, and to determine whether licenses granted shall be exclusive or non-exclusive, has been exercised to implement the allotment of territories. Compulsory licensing will be a cure and not a punishment for this.

It has been contended on duPont's behalf that compulsory licensing should not be decreed because it would not "cause duPont to export and would not affect in any way the result of past failure on the part of duPont to export." Perhaps this is so, and it leads us to observe that neither would a simple injunctive provision in the decree produce this result. But compulsory licensing will enable others to manufacture and put them in a position where they will be able to export. The application of this remedy might serve as an impetus to a sincere desire on duPont's part to enter the export field on an active and competitive basis.

To us, it seems that an effective method to establish competitive conditions is to decree compulsory licensing of all patents which were licensed among the conspirators and which were put to use in the production of products which were common to some, if not to all. It has rightly been ob-

served that "as long as the patentee is free to grant or withhold a patent license at his pleasure, the striking down of one set of restrictive conditions attached to a patent license may lead only to the adoption of another set of conditions which achieve the same effect." Compulsory Patent Licensing, 56 Yale Law Journal, 1946, p. 82.

With the compulsory licensing provisions with respect to patents, there must follow similar licensing provisions with respect to know-how affecting these patents and the products made under them. This must be so because it has been found that the exchange of know-how—as well as that of patents—served as a direct means for the accomplishment of the unlawful restraints; and because the supplying of such know-how and technology is necessary to the efficient use of the licensed patents and to the production by the licensee of products comparable in quality and cost of production to that of the licensor. The Government has asked that the compulsory licensing of know-how and technology be extended to include all "usable" processes—those processes now being used and applied and those which have been found to be of possible use but which are not currently being applied. The objection to the inclusion of "usable" processes because of difficulties in ferreting out those processes which have been tried only to be abandoned, and those known to be possible but never used, seems to us more fanciful than real. We have been impressed by the evidence throughout that the defendants function as extremely efficient and competently managed industrial organizations. The records of these "usable" processes will be available to them for disclosure; and it will be so decreed.

We have had evidence of three instances when United States manufacturers were denied licensing of ICI's United States patents because of the intervention and objection of duPont. At trial we deemed these facts to be significant as tending to establish the allocation of the United States as territory to be served exclusively by duPont. Now, we regard them important as indicative of ICI's undertaking not to exploit its United States patents save through duPont, or by anyone else without the consent of duPont. This was suppressing and controlling competition within the United States in those products which might have been manufactured under United States patents held by ICI. Accomplished as it was by mutual undertaking in restraint of trade, it was an abuse of the United States patent rights held by ICI and indicates the necessity for regulation of the exercise of ICI patent rights.

As to those United States patents owned by ICI which have been voluntarily licensed to others than duPont and on terms no less favorable, there is no present need for compulsory licensing. The patents which have been licensed to and used only by duPont have been subjected to the restraints placed upon exports of products manufactured by them; to remove the probability of future restraints and to correct the effect of past abuse as to these, compulsory licensing must be decreed. ICI owns United States patents which have not been licensed either to duPont or others and which ICI itself has not employed in products manufactured here or manufactured elsewhere and imported to the United States. These must also be brought within the ambit of the compulsory licensing provisions of the decree. Here, too, the provisions will be limited to existing patents as we have defined them.

Provision in the decree for compulsory licensing on a reasonable royalty basis does not present an insurmountable obstacle even though a number of patents may be involved. Difficult and time-consuming problems may be created in determining the royalties, but the answers are there and may be ascertained; difficulties to be encountered in finding these answers do not justify denial of the relief which the established facts require.

At least as to polythene and nylon, we have some standards as to reasonable royalties. While it is true that as to them question might well be raised as to whether they were arrived at after arm's length commercial negotiations, they do nevertheless furnish guide posts for future determination of the amount at which such roy-

alties should be set. But, in any event, as to these products and all others, there is also available for judicial finding the sum a prudent licensee would pay under all existing circumstances.

We shall not, however, include in our decree the provision proposed by the Government which purports to limit recoveries in a suit brought against an infringer to reasonable royalties. Such a provision would encourage infringement.

The provisions for fixation of reasonable royalties will follow substantially the provisions in anti-trust suits in which similar relief has been decreed and approved by the Supreme Court, National Lead, Gypsum, and Line Material cases. The royalties are to be determined by the court, when agreement has not been privately reached, on petition from the applicant and on proof submitted by the applicant and the defendant involved.

 The Government does not seek a decree directing ICI to grant compulsory licenses of its British patents. The Government requests that ICI be required to grant immunity under its foreign patents which correspond to the United States patents which we have made subject to compulsory licensing. Such a provision was included in paragraph "7" of the final decree in National Lead, 63 F.Supp., 495, 534, and left undisturbed by the Supreme Court. We have had testimony offered on behalf of ICI by an expert in British law that a provision for granting immunities is contrary to British public policy and that a British court will not enforce such a provision in the judgment of a court of a foreign jurisdiction. As to this, we observe that, acting on the basis of our jurisdiction in personam, we are merely directing ICI to refrain from asserting rights which it may have in Britain, since the enforcement of those rights will serve to continue the effects of wrongful acts it has committed within the United States affecting the foreign trade of the United States.

We are not unmindful that under British law there are restrictions upon exports from the United States by reason of the existence of the British patents owned by ICI. The exclusion of unlicensed imports and the prohibition of unlicensed sales is enforceable because of the legal rights which attach to a British patent.

 We accept as correct the statements in the brief of ICI that: "Under United States law if a product is patented, sale into the United States of that product constitutes clear infringement of the rights of the American patentee. Such sale will therefore subject the vendor to a suit for infringement even though his acquisition of the patented article abroad (and his use and sale of it there) may be wholly lawful. Boesch v. Graff, 1890, 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787. This is true even though the vendor may hold the foreign patent on the article in question. Daimler Mfg. Co. v. Conklin, 2 Cir., 1909, 170 F. 70, 27 L.R.A.,N.S., 534, certiorari denied, 1910, 216 U.S. 621, 30 S.Ct. 575, 54 L.Ed. 641; T. C. Weygandt Co. v. Van Emden, D.C. S.D.N.Y.1930, 40 F.2d 938.

"In the British Empire the law is even more stringent. The owner of a British patent may bar the importation of any product patented in Great Britain and also any product made by any process where the process is patented under British law. It is clear that a patent on a process essential to the production of a product is infringed by sale of an imported product made abroad by that process. Von Heyden v. Neustadt, 1880, 14 Ch.D. 230; United Horse Nail Co. v. Stewart and Co., 1885, 2 R.P.C. 122, 133–134; Saccharin Corp., Ltd. v. Anglo-Continental Chemical Works, Ltd., 1900, 17 R.P.C. 307, 318–319; Terrell, The Law and Practice Relating to Letters Patent for Inventions (London, 1934), pp. 173–177.

"There is no requirement under American law which required duPont to license ICI under its United States patents or ICI to license duPont under its British patents. To the extent that each retained the right under the laws of its respective country to assert patents against imports, this resulted in no limitation upon such imports which in any way exceeded the limitation that would have existed had there been

no agreement at all." But as we have heretofore observed these lawful rights were employed as means to accomplish the unlawful purpose of their underlying agreement.

While it is true that these rights exist independent of any provision in the patents and processes agreements, they were granted to ICI by the disclosure or assignment of inventions by duPont pursuant to the terms of these agreements. Inventions were also licensed by ICI to duPont for its exclusive use and exploitation in the United States in accordance with the agreements. In the first instance the patents were employed to restrain duPont's exports to Great Britain, in plain violation of American anti-trust laws; in the second instance, the patents were used as a means to prevent ICI exports to the United States and placed a restraint upon the foreign trade of Great Britain, in violation of her declared policy, if not her laws. It does not seem presumptious for this court to make a direction to a foreign defendant corporation over which it has jurisdiction to take steps to remedy and correct a situation, which is unlawful both here and in the foreign jurisdiction in which it is domiciled. Two evils have resulted from the one understanding of ICI and duPont—restraints upon the foreign trade and commerce of the United States as well as on that of Great Britain. It is not an intrusion on the authority of a foreign sovereign for this court to direct that steps be taken to remove the harmful effects on the trade of the United States.

 We recognize that substantial legal questions may be raised with respect to our power to decree as to duPont's foreign patents as well as those issued to ICI. Here, we deal with the regulation of the exercise of rights granted by a foreign sovereign to a domestic corporate defendant and to a foreign corporate defendant. Our power so to regulate is limited and depends upon jurisdiction in personam; the effectiveness of the exercise of that power depends upon the recognition which will be given to our judgment as a matter of comity by the courts of the foreign sovereign which has granted the patents in question.

 Where we have required ICI to grant immunity under British patents which are the counterpart of duPont's United States patents, the payment of reasonable royalty upon imports of articles manufactured under them into Great Britain shall be paid to ICI.

Full recognition is hereby given to the inherent property rights granted by the British patent to exclude from Great Britain merchandise covered by the patent. Since a license under the corresponding United States patent conveys no right to ship into Great Britain articles manufactured in the United States under the patent, no royalty shall be collectible by duPont upon such items as are destined for export to Great Britain.

We are advised that the present policy of the British patent law is to foster manufacture in the United Kingdom rather than to permit importation from abroad (12, 13 & 14, George 6 Chapter 87, (Patents Act of 1949); see also Patents and Designs Act of 1907, 25 Halsbury's Statutes of England, 1932). Sec. 27(2) of the Act of 1909 declared that a British patent would "be deemed to have been abused" if (subsection b), the working of the invention within the United Kingdom on a commercial scale "is being prevented or hindered by the importation from abroad" of the patented article "by the patentee or persons claiming under him," or by other persons against whom the patentee is not taking proceedings for infringement. Sec. 27, subsec. (b) of paragraph 3 further provides in substance that the comptroller of patents may when such abuse has been established preclude the importation into the United Kingdom of any goods, which in the absence of a license, would be deemed an infringement of the patent. The Patent Act of 1949, carried this public policy further in Sec. 37, to the extent that the comptroller of patents may order a "license of right" when, although the patented invention is capable of being worked in the United Kingdom, it is not being commercially worked "to the fullest extent that is

reasonably practicable", or demand is "not being met on reasonable terms, or is being met to a substantial extent by importation," or "commercial working of the invention in the United Kingdom is being prevented or hindered by the importation of the patented article" (20th Century Statutes, 1949, vol. 46, p. 1013). The grant of immunity under the British patents would be subject, of course, to the operation of these statutes and proscribed by such action as the comptroller of patents might take. This should not deter us from making directions we feel are required, even thought the application of them be limited in operation by the possible action of an official of a foreign sovereign.

It is urged that there is no precedent for these immunity provisions in our decree. It is argued that they are tantamount, because of the limitations imposed by British law, to directing ICI to grant compulsory licenses under British patents. A similar provision by the trial court, in National Lead, 63 F.Supp. 495, 534, it is said, was not litigated and no point made of it either before the district court or the Supreme Court. 105 F.Supp. 228. It is true that the policy of the British patent laws does not appear to have been specifically called to the trial court's attention, but from this we may not conclude that it escaped the notice and consideration of the learned and painstaking judge who presided. Nor may we accept the defendant's observation that the Supreme Court when considering the provisions in National Lead had in mind only the United States patents and that its attention was not focused on the last sentence in paragraph "7" of the decree before it, granting immunities under foreign patents. 332 U.S. 319, 336–337, 67 S.Ct. 1634. If this be so, it is better stated by others. We do, however, note that duPont, as here, was among the defendants in National Lead.

We have found that nylon was wholly a duPont development to which ICI made no contribution (Op. p. 107). The basic patents covering nylon have not expired.

The history of the basic British nylon patents reveals a studied and continued purpose on the part of ICI and duPont to remove these patents from within the scope of any decree which might ultimately be made by this court (Op. pp. 115, 116, 197, 198). These British patents were issued to duPont. By the agreement of March 30, 1939, ICI received an exclusive license under them; in January, 1940, ICI granted irrevocable and exclusive rights to make nylon yarn from nylon polymer (which is manufactured by ICI) to British Nylon Spinners, Ltd. (BNS). ICI has a stock interest of 50% in BNS, the remaining 50% is held by Courtaulds, Inc. BNS is in the business of manufacturing and distributing nylon yarn. Not content with this arrangement and with the deliberate purpose to "materially reduce the risk of any loss of rights" as a result of this suit (Ex. 708, p. 2705), duPont pursuant to the nylon agreement of 1946 assigned the basic British nylon patents to ICI. It is now urged that we may not decree with reference to these British patents so as to direct ICI to remove restrictions on imports into Great Britain of nylon polymer or nylon yarn from the United States. It is argued that the sum total of all these agreements is not to create by itself any restrictions against American imports, and that those which exist arise from the right to be free from competition which is inherent in the British patents and cannot possibly be repugnant to the American anti-trust laws.

BNS is not before this court; although they were knowing participants in acts designed to thwart the granting of full relief, we may not direct our decree to them. The lack of majority stock ownership in ICI likewise prevents control of the future acts of BNS by this means; however, we are not without some remedy still available.

Objection is raised by ICI that we are without power to decree that the British nylon patents may not be asserted to prevent the importation of nylon polymer and nylon yarn into Great Britain because BNS has rights which exist independent of those possessed by ICI. This overlooks the circumstances under which BNS acquired its rights to these patents by licenses from ICI.

It must be recalled that by the first written agreement between ICI and duPont, of 1939, duPont granted to ICI a license, which was exclusive in those countries designated in the agreement as "ICI exclusive territory" and non-exclusive in what was described as "ICI non-exclusive territory." (Ex. D. 1153, pp. 7801–2) The agreement further provided that ICI "shall have the free and unrestricted right to grant sub-licenses", to be known as "manufacturing sub-licenses", "only upon prior written approval of duPont"; in the event of the granting of these "manufacturing sub-licenses" by ICI, it agreed to secure in writing an undertaking binding the sublicensee as though it had been a party to the agreement between ICI and duPont. It was specifically provided that the sublicensee "shall obtain no greater rights" than granted to ICI (pp. 7802, 7803).

The nylon agreement between duPont and ICI of December 31, 1946, provides in paragraph III (Ex. D. 1163, p. 7869) for the assignment of patents and patent applications listed in Schedule "A" of the agreement in the nylon field. By this writing, ICI became the owner of the British patents, in which its interest up to that time had been that of a licensee. Throughout all these negotiations it appears that BNS was advised of the dealings between ICI and duPont concerning the British nylon patents. Both ICI and duPont are parties to the instant suit; they were advised in fact and realized that the further use and control of the rights pertaining to the British nylon patents were subject to a decree of this court to be entered in this suit. We find that in fact Courtaulds and BNS were also fully advised of this situation. The first, or "manufacturing sub-license" which BNS received granted to it no greater rights than had been acquired by ICI; it was subject to the same infirmities as existed against ICI. The second license granted after the assignment of the patents to ICI did not come to BNS as an innocent party. BNS, again, knew exactly what it was receiving; its rights are wholly subject to the inherent vices of the agreements through which they were acquired. We have found them to be taint-

ed with the illegality of the unlawful conspiracy; of this probability BNS was informed. The circumstances surrounding the execution of the assignment to ICI in December, 1946, makes this clear (Op. 198, Ex. 708). It is also recorded that on October 17, 1946, "Courtaulds appreciated the difficulty in which all parties were placed consequent upon the American litigation and were, therefore, willing to accede to a modification of the duPont/I.C.I. Nylon License Agreement" (Ex. D. 2158; p. 11277). On October 28, 1946, Courtaulds undertook to "take all steps in their power to secure that British Nylon Spinners also raise no objection to the conclusion by ICI of the new agreement * * *." (Ex. D. 2159, p. 11283)

We do not hesitate therefore to decree that the British nylon patents may not be asserted by ICI to prevent the importation of nylon polymer and of nylon yarn into Great Britain. What credit may be given to such an injunctive provision by the courts of Great Britain in a suit brought by BNS to restrain such importations we do not venture to predict. We feel that the possibility that the English courts in an equity suit will not give effect to such a provision in our decree should not deter us from including it.

In any event it appears that BNS would have the right under Section 63 of the Patents Act of 1949, as the exclusive licensee to bring suit for infringement against an importer of yarn and staple fiber. There would then be a speedy determination of the effectiveness of the immunity provision of the decree with reference to these products. If the British courts were not to give credit to this provision, no injury would have been done; if the holding of the British courts were to the contrary, a remedy available would not have been needlessly abandoned.

Specifically, with relation to nylon, the judgment shall provide that the agreement between duPont and ICI concerning the British nylon patents shall be cancelled; a new agreement may be executed by the parties granting a non-exclusive license, providing for the payment of royalties and

removing all contractual barriers to exportation.

Those charged by duPont with the direct management and development of nylon are of the opinion that

"Immediate steps should be taken toward promoting manufacture of nylon by one or more competent independent concerns through non-exclusive licensing and disposal of know-how." (Ex. G.J.–1. p. 1)

DuPont's president, C. H. Greenewalt, at a meeting with the Board of Directors of Chemstrand corporation in March, 1950, stated that duPont would also "be willing to consider" granting a license for Fiber V. (Ex. G.J.–2, p. 30). It also appears that "disposal of design and operating information and know-how for nylon spinning will put into hands of the purchaser practically everything he needs for successful spinning of Fiber V. * * *." "The basic nylon patents on polymerization and spinning of nylon also cover V, e. g., polyamides and polyesters, and so this patent protection expires simultaneously." (Ex. G.J.–1, p. 13).

It is to be noted that Chemstrand is owned jointly by Monsanto Chemical Company and American Viscose Corporation and was formed for the purpose of exploiting their acrylonitrile fiber.

The decision of duPont to license its nylon patents arose entirely from its unwillingness "to accept sole responsibility for supplying the market for nylon textile fibers." (Ex. G.J.–3, p. 34)

Following extended negotiations, on June 2, 1951, duPont undertook for payment of a fixed fee and agreed royalties, to design, procure materials and construct expeditiously a plant for the manufacture of nylon intermediates and nylon yarn, to assist in training of Chemstrand personnel, to provide manuals, and to "disclose to Chemstrand all technical information." (Ex. G.J.–13, pp. 116–118). We have had no testimony as to whether the Chemstrand agreement embraces patents and processes pertaining to Fiber V or Orlon. We assume, therefore, that it does not and that no technical information is "disclosed to Chemstrand about products or processes not specifically mentioned in the Contract" or of "any product other than a nylon product," as there defined. (Ex.G.J.–20, p. 185)

We accept the Chemstrand agreement as evidence that the compulsory royalty licensing of the nylon patents is feasible.

■ We come then to the 1946 polythene agreement, which regulates the licensing of inventions relating to polythene. This agreement, we have noted (Op. 106), was made two years after the filing of the instant suit; it is still operative. It was drawn with the apparent purpose of bringing the provisions of the agreement within the principle approved in Transparent-Wrap Mach. Corp. v. Stokes Co., 1947, 329 U.S. 637, 647–648, 67 S.Ct. 610, 616, 91 L.Ed. 563, that "Congress, however, has made no specific prohibition against conditioning a patent license on the assignment by the licensee of improvement patents" and "that the inclusion in the license of the condition requiring the licensee to assign improvement patents is not *per se* illegal and unenforceable." In that case the court, however, did conclude, "that does not mean that the practice we have here has immunity under the anti-trust laws."

■ We have found that the negotiations for the polythene agreements were had with the purpose of carrying out the plan to allocate territories and limit competition between ICI and duPont; that purpose continued after the polythene agreement of January, 1946. Polythene, it is not disputed, is within the patents and processes agreements (Op. 106). The provision for grant back of improvement patents perpetuates control of the product, after expiration of the basic patent, for an unlawful use—the division of territories in restraint of United States trade.

The fact that a competitor of duPont— Union Carbide and Carbon Chemicals Corporation—is sublicensed under ICI's basic United States polythene patents does not remove the need for compulsory licensing of these polythene patents. It was apparent from the evidence presented at the trial (Ex. 674), that the sublicense granted to Carbide came about as a result of its re-

fusal to embark upon the manufacture of polythene and to erect a plant at its own cost under a temporary license for the period of World War II. The sublicense to Carbide was not born of a desire to put a competitor in the polythene market or of a purpose of ICI to fully exploit its patents in this field in the United States. The vigorous competition created in this one segment of industry by the relaxing of the restraints ICI and duPont placed upon each other, is pointedly illustrated by the performance of Carbide under its sublicense. Carbide has become a far greater factor in the polythene business than duPont. In 1946, Carbide manufactured 7,263,830 lbs. at a net selling price of $3,849,829.90; duPont, in the same period, 1,848,815 lbs. at a net selling price of $977,128.80. This was accomplished although Carbide was subject to a royalty of 5% figured on the selling price, while duPont paid a favored lower rate of royalty. (Ex.D. 1203, p. 7979)

This situation continued through the year 1948 (beyond that date we are not informed). Thus, on March 29, 1949, duPont reported to ICI that

"Since the signing of the license agreement January 17, 1946, Carbide and Carbon Chemicals Corporation sales and use of Polythene amounted to 30,166,835 pounds on which a royalty of $725,075.67 was paid, while duPont's sales and use amounted to 7,380,115 pounds, a royalty payment of $121,-746.76, making a combined royalty payment of $846,822.43." (Ex.D. 1205, p. 7988)

Significant, too, is the fact that for the selling quarter of October 1, to December 31, 1948, the net selling price per pound of Carbide was $.4318 (Ex.D. 1205, p. 7989), and of duPont for the same period $.4515 (Ex.D. 1205, p. 7990).

We also note that Carbide took a license under ICI basic patents only and uses a process of its own. Carbide has not licensed duPont, and is not licensed by duPont to use its improvement or process patents. The figures afford a graphic example of what might well occur with other products with restraints removed and our anti-trust laws observed!

It is clear that the public does have the right to the protection of further competition in this product.

It is of interest to note that Carbide holds its license under the basic United States polythene patents held by ICI not under a grant from ICI but as a sublicensee of duPont. (Ex.D. 1199). The sublicense agreement is dated February 8, 1946. The license from ICI to duPont is dated January 17, 1946—only 3 weeks prior. (Ex.D. 1195) It is apparent from these dates that at the time the license was granted by ICI to duPont, there was already in contemplation and in the final stages of negotiation the granting of this sublicense by duPont to Carbide. The latter provided for payment of a cash consideration of $500,000 by Carbide to duPont, and royalties of 5% of the net selling price of untreated polymerized ethylene payable to duPont.

The royalties which are payable by duPont to ICI under its license from ICI are set at a rate graduated according to the amount of poundage produced under its license; starting at 5% of the net selling price of polythene polymers sold in bulk, it is gradually reduced until any excess over 20,000,000 lbs. is subject to a royalty of only 2% (Ex.D. 1195, p. 7939). By the end of 1948, the royalty payable by duPont was in the 2½% bracket. (Ex.D. 1205, p. 7991) But Carbide pays a straight 5% royalty irrespective of the total amount of sales throughout the period of license. (Ex. D. 1199, p. 7967).

Although duPont is required to pay over to ICI the excess in royalties it receives from Carbide, it was permitted to retain the cash payment of $500,000. (Ex.D. 1195, p. 7939). Carbide is compelled to operate at a selling price disadvantage as compared with duPont. And, beyond this, Carbide is required to "keep a separate record of polymerized ethylene manufactured and used or sold by Carbide," and to permit duPont accountants to examine these books and records "from time to time during business hours." (Ex.D. 1199, pp. 7967–8). DuPont may thus keep a watch and check on the activities of its competitor in the polythene field. This does not present a very pretty picture of competitive conditions

when establsihed by the joint action of ICI and duPont, not under judicial decree. While this might have resulted from the proper and lawful exercise of patent rights, we have found that the grant to duPont in the first instance to practice the invention was an abuse of the patent. This situation is a consequence of that abuse; it operated to place Carbide in a distinctly disadvantageous position, if and when, Carbide might seek to export its polythene products from the United States.

This polythene sublicense to Carbide by duPont is of greater significance when viewed in the light of prior dealings between duPont and ICI on the matter of sublicenses granted by one on an invention which originated with the other. As early as November, 1931, the Standard Oil Company made inquiry of ICI concerning the possibility of securing a license from ICI under one of its United States patents covering dyestuffs. When the matter was taken up by ICI with duPont the director of duPont's Foreign Relations Department in a memorandum to the Executive Committee set forth duPont's position with relation to the granting of sublicenses by one on the patents of the other in the following language,

"Under the Agreement, Paragraph IX, it is provided that no sub-license shall be granted by any licensee without the consent, in writing, first obtained from the original licensor. There is, we believe, no misunderstanding on this point between ICI and ourselves. ICI's suggestion, however, that they would be ready to discuss with us terms for Standard to acquire a sub-license, raises an inference with which we disagree. It is our feeling that once having granted us an exclusive license to a patent, the patent is entirely our property and if we decided to issue a sub-license under it, after first obtaining ICI's permission, the terms are entirely for us to decide and any revenue which might be received would be entirely for our account. Considering this point in its broadest aspects, we believe that any other course would be inconsistent with the spirit of the

Agreement and would lead to unsatis factory conditions. If ICI should propose to take all or part of any fees which we might receive from the Standard, it would naturally stimulate them to look for other similar cases and we should be constantly put in the position of having to refuse their requests or act as 'dog in the manger.' Naturally, the reverse would be true if it were a case of a patent under which we had given ICI an exclusive license for the British Empire. By taking a firm and clear-cut position to the effect that any sub-licenses in respect of any exclusive license granted by one party to the other, after having secured the approval of the original licensor, should be entirely under the control of the party holding the exclusive license and any fees charged by him to the sub-licensor should be his exclusive property, we shall be able to avoid difficulties and misunderstandings with ICI in the future." (Ex. 400, pp. 1702–03)

But several years later in May, 1935, it was recorded by duPont "that Mr. Lammot duPont should explain to Sir Harry that it was the opinion of our Legal Department that it would be necessary that royalties received from such sublicenses should be paid to the original licensor." (Ex. 409, p. 1727). The decision to take this action was prompted by the statement from duPont's legal department that,

"As stated in Mr. Lammot du Pont's letter to Sir Harry McGowan, dated April 22, 1935, it is the intent of the agreement that each party will be in a position to acquire from the other, at a fair price, those inventions which are of interest in its business. The purpose is to enable each party in its own operations, and only in those operations, to make use of the inventions of the other.

"Consistent with this purpose, Article IX of the agreement provides that neither party shall grant sub-licenses (except to its subsidiaries) under the inventions of the other without the latter's consent. The effect of this limitation is that each party retains control of all rights in its own inven-

tions, other than the right of the other party itself to practice the same.

"It would not be consistent with this intent to regard either party as being entitled to all monetary benefits obtainable in its exclusive license territory from the inventions of the other. The latter attitude would amount to a mere allocation of territory, under which each party would relinquish all monetary advantages which might be obtained from its inventions in the territory of the other. Such a complete and arbitrary allocation of territorial rights might be regarded as improper under the anti-trust laws of this country." (Ex. 409, pp. 1728–9)

Nevertheless, in October, 1944, we find duPont negotiating with ICI for the granting of a sublicense to Rohm & Haas on certain ICI United States patents covering production of monomers of methacrylic acid esters "with the understanding that of all royalties payable by Rohm & Haas under such license, 35% will be remitted to ICI, duPont retaining 65%" (Ex.D. 1559, pp. 9344–5).

And, later, in May, 1945, a modification was proposed by duPont and agreed to by ICI that when "a party has obtained a license under an invention which is subsequently found to be not used by it nor in definite prospect of going into use promptly, it shall surrender such license or accept a non-exclusive license in lieu thereof," but when such patents are "used or in definite prospect of use by the original licensee in connection with its manufacturing operations (and) are sublicensed to other manufacturers, any cash royalties for such sublicenses shall be divided equally between the owner and the licensee" (Ex.756, p. 2841). It was also then agreed that

"When patents and processes which relate to the use, treatment, or application of products within the field of the Agreement, as distinct from their manufacture, which products are manufactured or in definite prospect of manufacture by the original licensee, are formally sub-licensed, the original licensee shall in all cases decide wheth-er or not the sub-licensee shall be charged royalty. If royalty is charged, it shall be divided equally between the owner and licensee * * *." (Ex. 756, pp. 2841–42)

DuPont was especially careful to provide, however, that "these principles * * * do not apply to sub-licenses which have been negotiated previously or to the contemplated polythene sub-license to Carbide & Carbon." (Ex. 756, p. 2842)

Recognition by duPont and ICI of the "complete and arbitrary allocation of territorial rights" as "improper under the anti-trust laws of this country," (Ex. 409, p. 1729) did not deter them from traveling the course they had long followed. There is no further need to discuss the necessity for compulsory licensing.

The existing agreements between duPont and ICI affecting polythene will be cancelled; the rights to royalties thereunder will be preserved, but are to be exercised so as to remove barriers to competition whether among defendants, or between co-conspirators and others, both in the local markets and in the export or import of products in this field.

We have noted that at present there is no existing agreement between ICI and du-Pont covering neoprene. The licensing agreement of January 22, 1941 (Ex. 664) was cancelled by the agreement of May 23, 1946 (Exs.D–1696–1699). The United States patents held by duPont were never included in the license granted to ICI. At no time did ICI exercise the right to manufacture neoprene (Op. 104). But we have found that duPont did delay its "full development in the British Empire" for more than "a reasonable length of time" (Op. 103). However, it is clear from du-Pont's large imports through its own agents into the British Empire that this inaction did not interfere with the export trade of the United States. Compulsory licensing of the neoprene patents, therefore, will not be directed.

We have previously considered (Op. 194–5), the 1948 modification agreement between ICI and duPont concerning patents and processes. This followed shortly after

the 1946 nylon and polythene agreements. The Government proposes the compulsory termination of this agreement.

By the agreement of June 30, 1948, all licenses under United States patents theretofore granted by ICI to duPont under the patents and processes agreements are made non-exclusive; and in all licenses under British patents theretofore granted to ICI under the patents and processes agreements, there has been reserved to duPont and to its licensees the right to sell and to sell for use under the British patents so licensed to ICI. The agreement thus removes restrictions on ICI's right to manufacture or sell in the United States under its American patents; similar restrictions are removed from duPont so as to permit it to export to Great Britain under its British patents. It appears clear that ICI has by contract granted as to other products the very immunities to imports into Great Britain which it has urged we may not impose by decree as to nylon. Thus, unlawful restrictions have been removed by contract; it is far preferable that this be accomplished by voluntary act rather than by judicial decree. We will not set this agreement aside, for it creates no contractual obligations repugnant to the policy of our anti-trust laws. Sufficient remedy is available in an appropriate injunctive provision restraining ICI and duPont from modifying this agreement without permission and providing for no future contact or exchange of patents, process and technology. This existing agreement between ICI and duPont we shall let stand, accepting it as an effort to remedy illegal conditions. Cf. Hartford-Empire, supra, 323 U.S. at page 409, 65 S.Ct. 373.

The judgment shall prohibit duPont and ICI for a period of fifteen years from asserting any existing (as we have defined the term) foreign patent against any United States manufacturer, who has manufactured the product under a counterpart domestic patent. It shall contain a like prohibition against the assignment or licensing of any of these patents so as to permit others to assert them against such exports, and against the assertion by duPont of rights with respect to technical information to prevent or in any way limit the export of any products from the United States or the import of such products into the United States.

In addition duPont and ICI for five years shall not negotiate any license or assignment with each other under any existing or future patent either in the United States or elsewhere. We shall not interfere with the continuance on a non-exclusive, territorially unlimited basis of licenses heretofore granted by either to the other. We shall require duPont to file with the Department of Justice agreements executed within the next five years by which duPont licenses patents to foreign manufacturers. A similar prohibition and direction shall include technical information.

We now come to the extent of the relief which is to be granted with respect to the jointly owned companies. We shall first consider CIL, Duperial Argentina and Duperial Brazil; then CSAE, and lastly CBC in conjunction with the relief required as to ICI and Remington.

We have found that the jointly owned companies were either organized or acquired and used to accomplish the ends of an illegal agreement and understanding.

Joint ownership of these various companies provides an ever present opportunity for further wrongdoing. We cannot guard against the use of most of these jointly owned companies solely by restrictive and injunctive provisions. Something more is required. These companies were organized as instrumentalities through which the defendants sought to divide world territories and thus restrain United States imports and exports. The inclination to continue this basic understanding notwithstanding judicial decree has been established. Opportunities for the fulfillment of this inclination must be removed by means designed to make the severance of these relations permanent and lasting. This cannot be accomplished by permitting the defendants to remain as partners in all these jointly-owned and jointly-operated enterprises. These companies, long in existence and well organized, have personnel which for many years have been trained and accustomed to see that their organizations functioned, were operated, and their activities limited

in accord with the understanding and agreement of their owners and stockholders. It is more than the extreme of optimism to expect that overnight this personnel, located in Canada and throughout South America, will abandon practices they have so long and faithfully followed. Invoking "the harsh remedy of divestiture" Timken Roller Bearing Co. v. United States, supra, 341 U.S. at page 602, 71 S.Ct. 977, is made necessary not only to remove the opportunity and means to effect further restraints but to eliminate an incentive for the defendants not to compete.

 There is no substance to the contention that by directing divestiture of some of these companies we are extending this court's jurisdiction "beyond places over which the United States has sovereignty or has some measure of legislative control." Foley Bros. v. Filardo, 1949, 336 U.S. 281, 285, 69 S.Ct. 575, 577, 93 L.Ed. 680. Such a direction would not be an attempt to impose the regulatory provisions of the Sherman Act on commercial activities of business enterprises organized and operating under the laws of foreign countries. This court's decree will not be directed to the jointly owned companies; they are not parties to this suit; they have not been served with process and this court, therefore, has no jurisdiction over them. The decree will contain directives which govern the actions and conduct only of the defendants; as to them, we have concluded jurisdiction exists. We are directing that these defendants take definite action to remove restraints of trade placed upon the commerce of the United States. This is done, not by reason of the fact that the Government has been able to "catch" the defendants and to bring them within the jurisdiction of the court, but because their concerted acts have, in part, been committed here and the result of their agreement has directly affected our trade and commerce. The provisions directing divestiture of joint companies are consonant with the Foley case, supra, and American Banana Co. v. United Fruit Co., 1909, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826.

 We are not restricted by the fact that what the joint companies may have done was or was not lawful in those countries wherein they are located. These actions, whether legal or not where committed, were had pursuant to an agreement unlawfully made and consummated in part by acts of the defendants within our jurisdiction. It would be an idle gesture merely to say, "stop this; and cease what you have for so many years been doing"; firmer measures must be applied. That these measures direct the defendants to do certain things the effect of which is felt or realized beyond our borders is immaterial. Equity has often required such steps to be taken; like remedies have frequently been applied in anti-trust suits.

The Timken case presented the need for removal and eradication of restraints imposed upon our foreign trade with respect to one product, anti-friction bearings, and only in the tapered bearing industry. It has been noted that

"The Court's refusal to grant divestiture in this case was apparently motivated by two major considerations. One was a feeling that a more liberal rule of reason should be applied to international trade arrangements under the Sherman Act, even though similar arrangements under similar circumstances in domestic commerce might be deemed unreasonable. The second was that divestiture is a harsh remedy, and that it should not be employed if 'effective' alternatives are available." (Dissolution, Divorcement, Divestiture, by Walter Adams, Indiana Law Journal, Vol. 27, No. 1)

Whether we determine that the joint ownership of these companies is unlawful by adjudging them *per se* violations, or by applying the rule of reason to the restraints which followed their formation and operation, we arrive at the same conclusion as to the necessity for divestiture. Local companies formed to carry on local manufacturing seem to have been economically justified in some of the foreign countries in which the joint companies operated, particularly so with reference to some products. We cannot say that this is so with reference to all products. As to some neither tariffs, quota restrictions, nor governmental restric-

tions on foreign exchange presented obstacles to importation into these foreign countries of these unique products for which there was special demand.

But even if we were to find that governmental barriers were such as to foreclose some foreign markets to duPont, this would afford no justification either in law or in reason for duPont to have imposed restraints upon its foreign trade or to have associated itself with ICI in the formation of these companies throughout the world. We do not have here an instance where an industry recognized "that foreign markets consist of many legal and economic units" and determined to "go after each through separate means." Timken, supra, 341 U.S. 608, 71 S.Ct. 979. There was nothing separate about either the formation or the operation of these joint companies. Each in law functioned as a separate entity, but the management of all was controlled and directed to the accomplishment of the common end and purpose of the defendants.

Although divestiture when applied to these large and substantial joint companies is a harsh remedy, its application is made necessary because of the continued and defiant purpose of the defendants to violate the anti-trust laws. Persistent and continued violations, committed with full knowledge of their evil, may not be asserted as a defense to divestiture. The very magnitude of these investments and the extensive field of these operations served to increase the harm and damage done to our foreign trade; they now indicate the need for and make imperative the application of the divestiture remedy.

The facts found differ from those in the Timken case; here, we have found that the joint ownership of stock in these companies was unlawful for they were born of iniquity. "Timken did not sit down with competitors and divide an existing market between them" supra, 341 U.S. at page 607, 71 S.Ct. at page 979, here, the defendants did just that. We do not read the Timken case as holding that as a matter of law, it is an abuse of discretion to order divestiture in a case involving an agreement to divide world territories where the defendants do not dominate American production or other

American producers are exporting. We would not limit divestiture to those cases in which there is a domination of a domestic market or in which it is found necessary to fashion relief which will enable other American producers to enter foreign markets. Our purpose is to provide that duPont will be without restraints to export in competition with ICI, that ICI will be without restraints to import into the United States in competition with duPont and that these foreign companies will be without restraints to export into the United States and import from it.

Postponement of divestiture would only be deferring action which is made inevitable by reason of the far-flung territories embraced in the field of operations of these companies. Perhaps, if we were dealing with a single, jointly-owned company or with a group of such companies concerned with a single product, unsettled international economic conditions might dictate that an attempt be made by applying first only injunctive relief. But, after 40 years of continued use of this means of restraint of trade, during which period there has been an increase in the number of these companies, and in territories covered by them, it appears just too much to hope for that the gentle remedy of injunctive relief will put an end to the abuses which have been wrought through these companies.

In National Lead, the Supreme Court summarily affirmed the provisions of the final decree for divestiture of the interests of the foreign companies, quoting with approval the opinion of the District Court, 323 U.S. at page 363, 67 S.Ct. at page 1655:

" 'In other words, the stock acquisitions were part and parcel of the territorial allocation agreements, and probably were a necessary element in the establishment of the territorial arrangement.' "

Here, probabilities have been found to have ripened into actualities; we have found that not only were the jointly-owned companies recognized as necessary in the establishment of the territorial arrangements (Op. p. 119), but "(T)he history of each of these companies demonstrates the

unlawful purpose with which they were organized. * * *" (p. 123)

To permit joint ownership of the companies to continue "would afford opportunity to perpetuate the effects of the restraints of trade", United States v. Paramount Pictures, supra 334 U.S. 153, 68 S.Ct. 927, which we have found to exist.

The problem presented by the joint companies is of enormous magnitude and requires us to deal with a complex industrial situation. It involves five corporations (which have a large number of subsidiaries), with assets of a present value of over $400,000,000 invested in many separate plants located in Canada and throughout South America and which manufacture or market a great variety and number of products. The situation has become complex and enormous by reason of the continued unlawful acts of the defendants.

While it is true that the joint companies have made substantial contributions to the industrialization of the countries in which they were formed, we find that greater progress in that direction might have been made absent the restraints which their stockholders placed upon them. We find that they did not serve in all instances to establish "footholds" in these foreign countries for the advancement of trade and commerce with the United States. These "footholds" were established prior to the organization of the joint companies. The expanison and development of that trade might have been greater and more rapid without the restraints which accompanied their formation and which were observed in their operation.

It is important to note that the manufacturing facilities of the joint companies have not been equally developed. This is attributable in some measure to the state of advancement of the local economies of the territories within which they operate.

CIL has kept pace with the rapid growth of Canada's industrial economy. The accelerated utilization in recent years of Canada's natural resources has brought increased demand for industrial chemicals. The requirements have been met by energetic and efficient management. New plants and buildings have been erected and put into operation, modern equipment and machinery have been installed. These capital investments are shown in the balance sheet of CIL as of December 31, 1951 (stated at cost) at $74,535,112. Calculated at current prices, it is estimated that it would cost about $125,000,000 to replace this plant investment, exclusive of land. Its plants are located in the provinces of Nova Scotia, Quebec, Ontario, Alberta and British Columbia. It manufactures agricultural chemicals, cellophane, nylon, commercial and chemically pure chemicals, explosives, ammunition, fabrikoid, paints and varnish and kindred products. CIL also resells fertilizer materials, blasting accessories, explosives, rivets, x-ray film and photo products, organic chemicals, plastics, dyes and intermediates, neoprene and a number of other products. The company is now in process of further expansion; a modern commercial explosives works nears completion in Calgary; a plant to manufacture nylon intermediates is under construction near Maitland, Ontario; and a factory to produce polythene has been begun near Edmonton. The expenditures authorized to complete the current construction program of CIL add up to a sum in excess of $44,000,000.

Although CIL is an industrial empire in itself, it holds investments of $984,533 in subsidiary companies and has shares in other companies of a current market value of $1,092,000. In 1951, the total sales reached $137,900,000. CIL has become predominantly a manufacturing company, but it still uses a number of products imported from the United States and abroad. With respect to many of its products production more than meets local requirements. Thus, in the annual report—1951 (ICI J.Ex. 16, p. 7) it is set forth that,

"Total exports by Canadian Industries Limited showed an improvement over 1950 as substantial quantities of 'Cellophane' cellulose film were shipped abroad late in the year. Commercial explosives and detonators were in greater demand for mining and construction projects in various countries."

CIL has, along with the lessening of Canada's dependence on imports, grown far

beyond the plans and expectations of its organizers. Intended to serve as a selling agency through which the products of ICI and duPont might be sold to others in agreed proportions, it has grown to be itself not only a producer of many of these items but a large and substantial consumer. With this development of CIL, its importance and effectiveness as a means to accomplish division of Canadian trade has increased. CIL was not organized primarily to foster local manufacture or to develop Canada industrially; in origin it was but a vehicle for cooperation between ICI and duPont "to the maximum degree in so far as practicable in any venture involving the manufacture and/or sale of a product in which either or both principals are interested in so far as the products manufactured and/or sold are destined for Canadian consumption." (Ex. 174, p. 791).

With respect to Duperial-Argentina and Duperial-Brazil, the situation is quite different. Neither of these companies has developed local manufacturing facilities to the extent that CIL has. Resales of Duperial Brazil accounted for 90% of its business in 1948, and of Duperial-Argentina—42%.

Duperial-Argentina owns and operates two plants in Buenos Aires,—the Gerli plant which produces carbon bisulphide, enamels, thinners, finishes and phenotiazine, and the Sulphurica plant, which produces sulfuric acid, metric acid, alum hydrogen peroxide, gammexane mixtures and phenol formaldehyde plastics. Both of these plants have uncompleted expansion programs. Duperial Argentina has a third plant at Mendoza for the production of tartaric acid and cream of tartar.

In addition, Duperial-Argentina as a 72.2% stock ownership of Ducilo, which operates a plant at Berazategui for the manufacture of viscose rayon yarn, cellophane and nylon yarn. The balance of the stock in Ducilo is distributed—15% in Bunge & Born, and 12.7% in the so-called "French Group", which is made up of the interesting combination of Textile and Fin. Co., T.A.F., Société de Valeures Textiles, Société de la Viscose Suisse and Société de Participations de Rayonne.

Duperial-Argentina also owns 50% of the issued stock of Electroclor which operates a plant at Rosario for the production of ammonia, caustic soda, chlorine, hydrochloric acid, etc.; the remaining 50% stock in Electroclor is owned by La Celulosa. Duperial-Argentina also owns 100% of the stock issued by Orbea, Duperial Uruguay and Fabuca.

The Orbea plant at Buenos Aires manufactures at present shot shells, metallic cartridges and some metal sundries. Its expansion program, now in progress, for which commitments have been made, includes additional facilities for the manufacture of air cushion wads and .22 caliber ammunition.

Duperial Uruguay operates a plant at Montevideo where it produces phenothiazine and solium hydrosulfide. The Fabuca plant at Montevideo manufactures only shot gun shells.

As of September 30, 1949, Duperial Argentina had assets of around 164,000,000 pesos, transmuted somewhat arbitrarily at 25¢ per peso, to $41,000,000. (Ex.D. 2260). Its sales for the year ending September 30, 1949 amounted to 253,000,000 pesos or $63,250,000 (Ex.D. 2224); 58.2% of these sales during fiscal year 1948 (we do not have later figures) were of Duperial's local manufactures. (Ex.D. 2185). Its assets as reflected in the financial statement of the company as of October 31, 1951 are substantially the same in amount (Ex.G.J. 58); its total gross sales for October 1951 amounted to about 26,000,000 pesos. (G.J. 58)

Duperial Brazil operates but three manufacturing plants—one, at Sao Paulo which produces coated fabrics, zippers, thinners, shoe cements, polishes, waxes and cement (glue), another, at Barra Mansa for dynamite and sulphuric acid, and the third, at Rio de Janeiro for silicate of soda. Duperial Brazil has not been developed to the same level as Duperial Argentina. Duperial Brazil manages CBC, which manufactures ammunition and is jointly owned by ICI and Remington. As of September 30, 1949, Duperial Brazil had assets of around 229,000,000 cruzeiros, or $11,450,000 when converted at 5¢ a cruzeiro. (Ex.D. 2261). For the year ended September 30,

1949, its sales amounted to 467,000,000 cruzeiros or $23,350,000 (Ex.D. 2225), but during the fiscal year 1948 (we do not have later figures) 9.7% were of its local manufacture. (Ex.D. 2185)

The defendants object that the net result of divestiture provisions with respect to jointly-owned companies is that at no time or under any circumstances will ICI and duPont be permitted to have a joint interest in a company devoted to manufacture abroad. When such company is organized with a purpose to impose unreasonable restraints upon our trade or its operation results in effecting these unreasonable restraints, this is precisely what we hold.

As with patents, "the mere accumulation of (which), no matter how many, is not in and of itself illegal", Automatic Radio Co. v. Hazeltine, 1950, 339 U.S. 827, 834, 70 S.Ct. 894, 898, 94 L.Ed. 1312, so with foreign subsidiaries; the formation of a number of them in foreign countries is not in and of itself illegal. The wrong arises from the formation of a number of these jointly owned companies, all in conjunction with the same potential competitor, with the purpose of dividing trade and commerce.

The defendants urge that divestiture of the joint companies is not required by the needs of the situations we have found to exist. They advance decretal proposals which would divest the joint resale businesses of the joint companies and would confine the defendants' joint interests substantially to local manufacture in the specific foreign markets. It is argued by the defendants that with these safeguards the divestiture of the joint interests in local manufacture is not necessary and that a decree so directing would be an abuse of discretion. Specifically, it is proposed by the defendants that only continuance of that portion of the business of the joint companies which deals with the re-selling of the products of ICI and duPont be enjoined. ▮ To justify divestiture of joint ownership in the foreign companies we must find that it is necessary because of the type of violation committed and that there is no other adequate, less harsh but effective, remedy available.

The jointly-owned companies were each, in turn, organized to be vehicles for the joint development of local markets in foreign countries. Restraints were placed upon the commercial activities of these joint companies, and restrictions were placed upon their exports to the United States. They were designed as instruments through which the defendants were to conduct their export trade to the local markets served. Exports by duPont to that area from the United States were restricted to quota set by agreement. The joint companies served to divide export trade to a territory which had previously been recognized by the defendants as non-exclusive. The method of operation devised to regulate the exports to the local area was to funnel them through the joint companies. These exports fell into two groups—those utilized by the joint companies in their own manufacturing operations, and those resold by the joint companies as a selling agency to others in the local market. The first group of exports was allotted among the joint owners; the apportionment was controlled by the joint committees and accomplished by directions given to the local management. The agreed quota on the second group of exports was maintained by confining the resale function to the joint companies.

Injunctive relief prohibiting these joint companies from continuing to function as reselling agents for their stockholders' products may not be granted, for the joint companies are not within our jurisdiction.

As to future dealings with the joint companies, after divestiture or reorganization by severance into separate enterprises, ICI and duPont shall be enjoined from reselling any product through them or through any reorganized segment of them in which the other has an interest. The joint companies shall not be in a position to act at the same time as the distributor of the products of both ICI and duPont; they shall be continued as the distributor only of the one defendant who may acquire it. Where ICI and duPont shall not be permitted, in the future, to employ the same distributors, the result will be to require them to sell in

these territories themselves or through other agents or distributors.

The judgment shall also enjoin ICI and duPont from asserting patents or rights with respect to technical information so as to prevent or limit exports of the joint companies or units of them to the United States.

A directory of the plants, products, and major markets served by each of the separate departments of CIL is set forth in the Annual Report of CIL for 1951 (Ex. ICI—J. 16, p. 32). From the evidence presented on trial and on the proceedings to determine the extent of relief required, we find that it is feasible and may be desirable for defendants to effect a physical division of the separate manufacturing ventures of CIL (see also G.J.–58).

We also find that it is feasible to effect a physical division of the separate ventures of Duperial-Argentina and of Duperial Brazil.

 Under the alternatives we shall provide these joint companies may become the wholly-owned or controlled subsidiary of either ICI or duPont. In the event that any of these joint companies be acquired or controlled by either of the defendants, it will be provided that the other shall not refer any order to the joint company, or use it as a distributor of its products. It is not our purpose to restrain the defendants from operating in a foreign market through a wholly-owned or controlled subsidiary; but the use of that subsidiary to impose agreed restrains upon the foreign commerce of the United States must be prevented. We do not by so decreeing impose American policy in matters of concern local to a foreign sovereign. We do seek to control and direct the actions of an American company and a foreign fellow conspirator over whom jurisdiction exists insofar as their actions violate American law and impose restraints upon our foreign commerce. When we do so, we are not unmindful that ICI is incorporated under the laws of Great Britain, that its principal office and its activities are there centered and that its operations are dominated by British necessities. We do not presume to dictate the manner in which the affairs of ICI are to be conducted; whether the exports of ICI to the United States are to be continued to be restricted is to be determined by those who direct its affairs and by the British authorities. This observation is equally applicable to the joint companies organized under the laws of other foreign countries. The provisions of our decree recognize and are compatible with this limitation on our authority and jurisdiction.

Although we shall permit, in the alternative, either ICI or duPont to acquire the stock interest of the other in any of these jointly owned companies, the single ownership of these foreign companies will not operate as a continuance of the unlawful restraints. To be sure, if duPont thus acquires one company, the exports of duPont products to the local territory of that company may be diminished particularly as to those products which it is found can be more profitably manufactured locally. But as to those products which can be more profitably manufactured here, the probabilities are that duPont exports will be increased. In any event, whether duPont's exports to that local territory are thus increased or diminished is not of prime importance under our economic views as expressed in the anti-trust laws. It is essential that these exports be no longer subjected to restraints imposed by agreements with a competitor as part of a plan to allocate territories.

There was no evidence presented to establish price-fixing by the defendants save in respect of the resale of common products through the joint companies. We shall provide for the abandonment of this practice, preserving to the defendants the right of fair trading under the provisions of the Miller-Tydings Act, 15 U.S.C.A. § 1. We see no occasion for the inclusion in the judgment of a provision prohibiting the granting by defendants of exclusive distributorships in the United States or abroad; sufficient safeguards are created by forbidding such exclusive distributorships to be granted by one defendant to the other.

We now come to consider the relief necessary with relation to CSAE.

We have previously narrated the circumstances surrounding the formation of CSAE

(Op. 135-6-7). We have found that the purpose of this company was unlawful. Its history and its present economic significance to the foreign trade of the United States must be now considered in determining the need and reasonableness of the remedies to be applied. Here, as in all remedies, our end is not to punish for past violations; they are to be given weight only in fixing the extent of the relief so as to guard against a probable and likely recurrence. Our judgment must be projected to the future and provide against future restraints upon our foreign trade.

CSAE owns and operates but one plant at Rio Loa for the manufacture of dynamite. DuPont owns 57.61% of the outstanding common stock and ICI owns the balance. This company was formed solely for the local manufacture of explosives; it has continued to be operated only for that purpose. It was intended to and did cater to supplying the explosives needs of the extensive local mining operations. There has been no evidence that the export of its explosives to the United States was ever feasible; the only testimony received was to the contrary.

DuPont recorded in July, 1919, that it was motivated in joining with ICI to form CSAE by a desire "to retain the position it has heretofore enjoyed of supplying a large part of the requirements" for commercial explosives in the northern part of Chile and in Bolivia (Ex. 5, p. 58). There was at the time a desire on the part of the Chilean Government to have a military powder factory in Chile and a willingness "to give facilities in the commercial business to any manufactureres willing to help them with the military project." The Chilean Government had "increased the import duty by 50% as part of a general tariff increase and without consulting the explosives importers." (Ex. 9, p. 80) It was under these conditions that ICI and duPont jointly undertook to erect and put in operation a dynamite plant in the northern part of Chili.

Had CSAE been organized with the sole purpose of meeting these existing conditions, there would have been no violation of our anti-trust laws. But, it was also decided by duPont "to proceed in cooperation with the Explosives Trade Limited with negotiations for the acquisition of the black powder plant at Calama, Chile." This was prompted by recognition of possible inroads in competition, arising from the "distinct tendency for new competitors to enter the South American markets" and, particularly, from Atlas and Hercules, two American powder concerns (Ex. 9, pp. 78, 81, 82). It was then that Atlas was brought into CSAE as a partner stockholder and was allotted 15% of the capital stock. The three partners, ICI, duPont and Atlas, turned over their Chilean and Bolivian import business in commercial explosives to CSAE, and subsequently "by concerted action certed abstention, restraint was placed upon American foreign trade." (Op. p. 138) This action followed the pattern of operation first applied in CIL (Exs. 22, 23, 25).

We have found that CSAE was formed at the time of the making of the "South American Pooling Arrangement" by which duPont and ICI agreed to share equally the net profits from their separate sales of explosives and blasting supplies for shipment to the countries of South America (Op. 139). It was later and in 1925 that ICI and duPont agreed "to grant to DAG a 25% quota of the high explosives business done in Chile and Bolivia by the two interests, viz., CSAE and DAG" and to form EIL to accomplish a similar division in the other markets of Continental South America (Op. 144). The further division of these markets continued; in 1937 CSAE was party to an agreement with EIL and two Belgian powder companies granting to them a definite quota for the sale of commercial explosives in South America (Op. 149). The South American explosives market had then been allocated among ICI, duPont, and German, Norwegian and Belgian manufacturers and CSAE had been a direct party to these negotiations.

However, in 1938 "duPont, on the advice of their Legal Department, retired from their participation in Explosives Industries Ltd." (Ex. 634, p. 2356).

Whether the acquisition by duPont in late 1942 of the Atlas interest in CSAE was due entirely to the fact "that the joint ownership by two U. S. concerns in a company

producing one of their major products was contrary to the Sherman Anti-Trust law" (Ex. 1221), or to enable "duPont to apply as a credit against its Federal income and excess profits tax a portion of the taxes paid by CSAE to the Chilean Government, which benefit was not formerly enjoyed when the ownership was 42%" (Ex. D–1314, p. 8403), we are not informed by the evidence. It becomes important, however, in determining the extent of the relief required. If the purchase of the Atlas interest in CSAE was the result of a purpose to cease violating the law, it should receive weight; if to afford duPont additional tax deductions, while sagacious from a business point of view, the purchase would be of no moment to us. Perhaps, it may have been a combination of purposes; we are in doubt. DuPont is entitled to benefit from that doubt, and we find that the purchase of the Atlas' interest came about as a result of a purpose to conform with our law.

▮ In either case, we take the facts as presented—Atlas is out of the company; ICI and duPont are the sole owners; it operates but one plant in Chile; it functions solely to meet the requirements of a local market in a foreign country; it deals in one product; exportation by the company to the United States is not feasible; the possibilities of presently encouraging exports from the United States in this field to this market are doubtful and remote save as to raw materials; since 1938 duPont has had no financial interest in EIL and the competitive situation as to exports of commercial and other explosives from Europe to South American markets has been radically altered by world events in the intervening years. Economic conditions, a growing national concern in Europe for the increase and development of home industries, and governmental encouragement, supervision and control of exports of these industries indicate that the early revival of the "cartel" which flourished prior to World War II is not probable. Appropriate injunctive measures to prevent future allotment of purchases of raw materials appear sufficient.

We now have a national economy which is neither on a wholly peacetime nor war-time basis. The government proposal of divestiture of this company must be realistically considered. We shall not at this time order divestiture as to CSAE; we shall observe its operations for a period of five years under the general injunctive provisions we have before set forth.

We shall, however, perpetually enjoin ICI and duPont from voting their stock interests so as to enlarge the corporate activities of CSAE to include the manufacture of products other than those now being produced, excepting however by-products thereof which may hereafter be developed.

▮▮ The Government also seeks the inclusion in the decree of provisions affecting Remington. It would enjoin Remington from maintaining legal exclusive distributing arrangements with any manufacturer or distributor of sporting ammunition. Evidence was submitted and findings made only with respect to the exclusive distribution arrangements made by Remington with Orbea (Op. pp. 179–82), and CBC (Op. pp. 190–92). We have had no evidence that the selection of Remington's other agents or distributors in foreign sales was had with a view to conforming to the understanding which we have found to exist. Absent proof that the designation of an exclusive distributor was made to achieve an illegal end, such a commercial arrangement is not illegal *per se*, United States v. Bausch & Lomb Optical Co., D.C., S.D.N.Y. 1942, 45 F.Supp. 387, affirmed 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024. There is no reason for enjoining Remington from granting exclusive distributorships to persons other than those named as defendants or conspirators, their agents or subsidiaries. Cf. United States v. Colgate & Co., 1919, 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992; Timken v. United States, supra.

It is a generally recognized custom to grant exclusive sales agencies and distributorships in the sporting ammunition trade. The power of the court to interfere with or disrupt the lawful continuance and use of this practice was considered in United States v. Bausch & Lomb Optical Co., 321

U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024, where the Court said:

> "Congress has been liberal in enacting remedies to enforce the anti-monopoly statutes. But in no instance has it indicated an intention to interfere with ordinary commercial practices." 321 U.S. at page 728, 64 S.Ct. at page 816.

The Government also asks that we enjoin Remington from entering into any agreement with a distributor to "fix or maintain prices or price ranges or other terms and conditions for sale or re-sale to be adhered to in any territory or market." There was no proof of price-fixing agreements to which Remington was a party other than that between Remington and ICI which concerned sales by Remington to CBC (Op. p. 191). The effect of the injunction which the Government seeks would be to deprive Remington of the benefit of the provisions of the Miller-Tydings Act and of the "Fair Trade Acts" of various states. Remington has a large number of resale price maintenance contracts with dealers and distributors who are in no way involved in this suit. That these fair trade contracts do not violate anti-trust law is clear; Schwegmann Bros. v. Calvert Distillers Corp., 1951, 341 U.S. 384, 71 S.Ct. 745, 19 A.L.R. 2d 1119, did not place such contracts beyond the pale of the law. We find no justification for enjoining Remington from entering into agreements specifically made legal by state and federal law, when there has been no charge of and nothing to show an abuse. We do not have proof that fair trade contracts have been misused to accomplish a price-fixing conspiracy. There has been no evidence that price-fixing by Remington in these sales was the result of any concerted action between Remington and ICI. Likewise, there has been no evidence to support a finding that exclusive distributorships or selling agencies have been established by Remington with a view to limiting or restricting competition with ICI in designated territories assigned to any distributor or selling agent other than to those we have found to be conspirators.

We come to consideration of the need for relief with respect to the joint-ownership of Remington and ICI in CBC. For many years Brazil had been one of Remington's best overseas markets (Ex. D 2232). CBC as the producer of military ammunition for the Republic of Brazil occupies a position of importance and significance. A division of the physical assets between Remington and ICI, we are convinced, cannot be accomplished; the company functions and must, if it is to be successful, continue to function as a single unit and entity.

The development of CBC has in great measure been due to continuous technical support received from Remington. This development might have been far greater had Remington and ICI been unhampered by their mutual commitments. Incentive was diminished by limitations they placed upon their individual returns.

CBC was purchased by ICI and a joint interest sold by it to Remington to regulate competition between Remington and ICI in Brazil. The requirements of the local Brazilian market at present more than exceed the output of CBC. There is demand in Brazil for Remington products; Remington response to this demand continues to be limited by the agreement with ICI.

Testimony was given that within approximately eighteen months the manufacturing facilities of CBC will be expanded sufficiently to meet the entire demand for ammunition in the Brazilian market. If this be so, any possible need for divestiture will shortly disappear.

What we have noted before concerning CSAE applies to our consideration of CBC. We have had evidence of a present policy of the Brazilian government to protect Brazilian manufacturing enterprises from the competition of imported products.

CBC is the largest and most popular concern selling sporting ammunition in Brazil. The powder used is purchased from a local government owned plant; none is imported. No purchases are made from duPont, and none but a small amount of brass and gilding metal from ICI. Prior to 1948, CBC purchased primers for shot shells from Remington, but since that date it has been unable to do so because it cannot get an

import license from the Brazilian Government. CBC is now manufacturing its own special primer for this type of shot shell. The need for divestiture is not indicated by present restraints upon imports of raw or partly manufactured materials from the United States; CBC has no products available for export.

But as to manufactured ammunition, we accept the view expressed by the manager of Remington foreign sales on November 16, 1945 that it is desirable "to withdraw the Remington Agency from CBC and place it in the hands of others," and "that it would be a good thing" for Remington if it had "an alert and aggressive agent who would push our (its) products" (Ex. 1322, p. 4910). We shall enjoin Remington from continuing CBC as its agent or distributor so long as joint ownership of CBC resides in ICI and Remington. We shall enjoin also the continuance of any agreement between ICI and Remington on the division of business or profits derived from the sale of imported sporting ammunition in Brazil or elsewhere (Ex. 1323, p. 4912). In addition, ICI and Remington shall be directed, through exercise of their right as owners of the entire outstanding stock of CBC, to provide that the future management and operation of the affairs of CBC shall be independent of Duperial Brazil.

We shall not at this time order divestiture as to CBC. We shall observe its operations for a period of five years under the restrictions we have placed upon the future conduct of ICI and Remington. Limitations on voting to expand the corporate activities of CBC, similar to those imposed with reference to CSAE shall be directed to ICI and Remington.

As to patents and technology, the need for injunctive relief affecting Remington is quite different from that required with respect to ICI and duPont. The licensing of patents and the exchange of technical information was limited to one product— sporting ammunition. The patents licensed by Remington to ICI were but two in number; these have expired; no license has been granted to ICI by Remington since 1948. Only one license was granted by

Remington to Duperial Argentina; this has also expired. General injunctive provisions are required which would prohibit Remington from reviving or renewing any of the patents and processes agreements; from forever granting to or receiving from any of the defendants or co-conspirators any right to patents or technical information except on a non-exclusive, territorially unlimited basis with a fixed and stipulated royalty; from granting to or receiving from ICI for a period of five years from date of the judgment without prior permission of this court, any patent rights or technical information; and from forever using the licensing of its patents or the exchange of its technical information so as to restrict the import to, export or sale of sporting ammunition in any country or locality. We find no necessity for decreeing compulsory licensing of Remington patents or technology.

We have previously observed that "no proof has been presented as to the extent of the stock-holdings of any" of the individual defendants, that they "committed no acts of personal wrong calling for censure or condemnation," that "their acts were not calculated to bring them direct personal gain" and that they acted only for and on behalf of conspiring corporations pursuant to and under the authority of their corporate board of directors. (Op. pp. 192–3). No additional evidence has been offered concerning the individuals. Nevertheless, the Government now asks that they be enjoined from owing or acquiring ICI stock or from holding any office in ICI or its affiliates. We see no necessity for the inclusion of such an injunction. Cf. Hartford-Empire Co. v. United States, supra, 323 U.S. 428, 65 S.Ct. 373. It appears sufficient to direct the decree against these and other individuals, acting in their capacity as employees, agents and officers of the corporate defendants, and to retain jurisdiction over them for a period of five years so that if occasion arises appropriate remedies may be applied.

Let a decree conforming with the foregoing be settled on notice within 20 days. from date hereof.